PAUL FIRENZE, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 31543.)

JOHN LANDRY, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 31636.)

EVELYN LANDRY, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 31637.)

Court of Claims, April 15, 1955.

*Dwight L. Murphy* for Paul Firenze, claimant.

*Richard C. Mitchell* for John Landry and another, claimants.

*Nathaniel L. Goldstein, Attorney-General (Harold S. Coyne* of counsel), for defendant.

LOUNSBERRY, P. J.   These claims arose out of an accident, which occurred about 9:30 P.M. on August 8, 1951, at the intersection of State Highway Routes 104 and 104-B and were tried jointly.   It was a dark, clear night and the highway was dry.

Route 104 runs in a generally east and west direction from the city of Oswego to the village of Mexico.   Route 104-B, which was reconstructed by the State of New York in 1950–1951, runs in a generally north and south direction connecting with Route 104 at the scene of the accident.

The intersection of the two highways was accomplished by means of a new and unusually complicated channelized design; there being only one or two other such designed intersections

in the State. Route 104-B was officially opened by the State of New York for unlimited use on August 7, 1951, the day before this accident.

The intersection was so constructed that automobiles going south on 104-B would keep to the right of the islands in the intersection, if intending to proceed west on Route 104. If the traveller were going east on 104, he would then keep to the right until about midway of the most northerly island, then turn left across the island to the north lane of 104-B and across the west lane of 104, then cross another island in 104 to the east lane thereof.

Charles Smith, twenty-four years of age, the owner and driver of the automobile, and Paul Firenze, twenty-four years of age, drove from Fulton to Oswego where they had supper at a restaurant, after which they picked up the claimant, Mrs. Evelyn Landry. They drove to Little Texas stopping at Gallagher's Tavern where they each had a bottle of beer and listened to the juke box. They subsequently decided to go back to Oswego by way of Route 104. All three were riding in the front seat; Smith was driving and Mrs. Landry was sitting in the middle. Smith had not driven on this highway before and was therefore unacquainted with the intersection although he believed he would at some place come out upon Route 104. He proceeded straight ahead on the left side of the islands, which is the northbound lane of 104-B, across the intersection onto Route 104 where he collided with another automobile proceeding easterly on Route 104.

A "One Way — Do Not Enter" sign had previously been located at the apex of the most northerly island on Route 104-B. Apparently the purpose of this sign was to keep vehicles to the right and out of the north lane of 104-B. The sign had, however, been removed prior to the accident. The State contended that this sign had been replaced by a "Keep Right" sign, also that there was a junction sign and a "Stop" sign near Route 104, and a "Stop" sign for the access road through the island. Smith testified he saw the stop sign on the island, which was facing northwesterly, when he was opposite it. He applied his brakes but could not stop before the collision. This sign was for the direction of traffic entering the access lane across the island. Smith and claimants insist they saw no other signs. There were no white dividing lines in the highway. Smith, with two witnesses, went to the scene within twelve hours after the accident for the purpose of checking what signs were in existence and each testified that no signs were present except the stop

sign on the access road. From the fair weight of the testimony, we are of the opinion that the only sign present at this intersection for the direction of traffic was the stop sign on the island facing at an angle to Route 104-B, and that the "Keep Right" sign was not in existence, or at least was not in place on the night of the accident. There is evidence that it had previously been knocked down and re-erected.

It was reasonable for Smith to follow the main highway as he did in the absence of white directing lines and warning signs. A State trooper, who was patrolling Route 104-B some time prior to the accident and familiar with the intersection, testified he missed the right-hand lane and went straight ahead to the left of the island and onto Route 104. There were no signs as one approached the intersection requiring reduction of speed or warning of the entry into a channelized intersection.

Claimant Mrs. Evelyn Landry, twenty-one years of age, was taken from the scene of the accident to the Oswego Hospital. She was suffering from shock and concussion of the brain. It was also found that she had sustained a compound fracture of the ankle and foot with the ends of the tibia and fibula protruding through the flesh. She also had lacerations about the head and four front teeth were chipped and damaged; it was necessary to file these down and they are now sensitive to heat and cold. The loose pieces of bone in her foot and ankle were removed and the fracture reduced and a cast applied. She remained in the hospital until October 13, 1951, when she was removed to her home by ambulance, staying in bed until she returned to the hospital in November, 1951, for the removal of the cast, after which she walked with crutches. On January 14, 1952, she returned to the hospital for an operation to adjust misplaced bones in her ankle. At the same time the Achilles tendon was severed and a metal screw inserted through the tibia into the astragalus. The purpose of this operation was to give her a fixed foot. On February 9, 1952, a new cast was applied and later a walking iron was inserted and she continued to wear the cast until June, 1952, when it was removed. She then walked with the aid of crutches and a special shoe for several months. At the time of the trial, the medical testimony indicated she had as complete a recovery as could be expected. She walks with a limp which is painful. The muscles of her leg have atrophied and the leg is shortened one-half inch. It is necessary for her to wear an ankle brace. She will not be able to wear high heel shoes or engage in many normal activities which she previously enjoyed. These conditions are permanent. The

injuries prevented her from doing any of her household work and caring for her children for many months and at present she cannot perform all her household duties. Her husband, John Landry, changed his employment so that he could be near home to assist with the household work and care of his wife and children.

Paul Firenze was brought to the Oswego Hospital by ambulance where it was later found he suffered a fracture of the sixth vertical vertebra, which impinged and ruptured the spinal cord causing paralysis of his body from his neck down. He remained at the Oswego Hospital for twenty days and was then removed by ambulance to the Veterans Hospital in Buffalo where he was a patient for eighteen months. Curative therapy was administered, including the use of Canadian crutches and a wheelchair. During his stay at the Oswego Hospital a traction collar and pulleys were applied to his neck. At the time of the trial claimant was able to walk approximately 100 feet with the aid of the Canadian crutches. His right hand, arm and leg are almost completely useless. His left side regained some of its former functions. The majority of the nerve impulses were completely destroyed with loss of control of his bladder and bowels. He suffers continuous pain in his arms, legs and hands, has muscle spasms in his legs, feet, arms and hands whenever he attempts to flex his muscles or use his limbs; his skin dries up and flakes off. He constantly wears a brace on his right leg and foot, and a hand brace at night to keep the fingers on his right hand from "clawing up." His sex desires and impulses are completely destroyed. He cannot eat without assistance; he cannot dress himself, has very low blood pressure, does not care to eat and is thin and undernourished.

The medical testimony is in agreement that all of these symptoms are permanent and that he never again will be gainfully employed. Prior to the accident he had been an active, normal young man, and had served in the United States Navy. Dr. Murphy, the State's doctor, characterized Firenze's condition: "It is a helpless picture."

The doctors disagree as to the probable life expectancy of the claimant. His doctors agree that with good medical care he may expect a normal life span, while the State's doctor is of the opinion that his life expectancy will be no longer than fifteen to eighteen years.

The construction of this type of channelized intersection required the best means of acquainting the public with its intricacies such as adequate warning signs and white line mark-

ings, which measures the State failed to provide. Its very design made it potentially dangerous. " The State must erect warning signs where necessary. If their absence is the proximate cause of injury to persons or property, the State is liable." (*Ziehm* v. *State of New York,* 270 App. Div. 876.)

The proof is in accord as to the existence of the stop sign on the access road in the island. There is disagreement as to whether the " Keep Right " sign was in place on the night of the accident. However, we feel as noted above that no such sign was on the highway and there were no other adequate warning signs. The highway should not have been officially opened until all necessary safety precautions had been taken.

The State is required to keep its highways in a reasonably safe condition. It is bound to exercise reasonable care to accomplish this and is also responsible for injuries or damage as a result of its negligence in creating a dangerous condition upon its highways. (*Wenzel* v. *State of New York,* 178 Misc. 932; *Bushey* v. *State of New York,* 305 N. Y. 744.)

The court finds that the claimants were free from contributory negligence and that the proximate cause of the accident was the negligence of the State of New York, its agents and employees, in failing to provide adequate warning signs of a dangerous condition of the highway created by this intersection.

Claimant Paul Firenze is given an award of $90,000, inclusive of hospital and doctors' bills. Claimant Evelyn Landry is given an award of $25,000 and John Landry is given an award of $7,544.53 for hospital and doctors' bills for his wife, claimant Evelyn Landry, and for the loss of her services.

The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440.)

Let separate judgments be entered accordingly.